70

1  Q. Let's look at Fratz-3 for a second.
2     Have you ever seen these types of
3  agreements before, credit card agreements?
4  A. I've seen something similar.
5  Q. Are you familiar with how they work?
6  A. No.
7  Q. Not that it's interesting, but have
8  you ever read an agreement?
9  A. Have I ever read one?
10 Q. Yes, a credit card agreement.
11 A. All the way through, no.
12 Q. Now, your testimony is that you don't
13 recall receiving any of these customer
14 agreements when you got your new credit
15 card back in 2002; is that --
16 A. Correct.
17 Q. -- your testimony?
18 A. Yes.
19 Q. So you are not aware of what that 2002
20 terms and conditions may have said,
21 correct?
22 A. Correct.
23 Q. So it's possible that a 2002 agreement
24 or any agreement that you may have received

71

1  after, that you don't recall receiving, may
2  have included language that may have
3  said -- strike that question.
4     Do you understand what it means to be
5  a class representative?
6  A. I'm representing the class.
7  Q. Do you understand what those
8  responsibilities are?
9  A. I'm not fully aware of the
10 responsibilities, no.
11 Q. Do you expect to receive any
12 compensation for being the class
13 representative?
14 A. Yes.
15 Q. Do you think you're going to have
16 difficulties with your job? You've
17 indicated it's hard to take time off. Do
18 you think your job will interfere with your
19 ability to be class representative?
20 A. No. I believe if I give them enough
21 notice and explain to them the severity of
22 the situation, they will provide me with
23 the time.
24 Q. But you didn't do that for the

72

1  arbitration in Bucks County, did you?
2  A. No, I did not.
3  Q. Is it your understanding that you have
4  agreed to pay attorney fees for your
5  attorney for services that he's providing
6  for you in this class action lawsuit?
7  A. Yes.
8  Q. Are you aware of any other persons who
9  have been sued by Goldman and Warshaw where
10 customer agreements similar to Fratz-3 have
11 either been attached to the complaint or
12 have been produced for arbitration or
13 litigation purposes?
14 A. Can you repeat the first part of the
15 question.
16 Q. Are you aware of any other persons who
17 have been sued by Goldman and Warshaw? And
18 in those lawsuits, were customer agreements
19 attached either to the complaint or they
20 were supplied later on in support of
21 documents that would be introduced either
22 at an arbitration or at some trial?
23 A. Am I aware of their existence?
24 Q. Uh-huh.

73

1  A. No, I am not.
2  Q. So you wouldn't know if there are
3  other people out there who have suffered
4  injuries based on similar claims that you
5  are asserting here in this lawsuit today?
6  A. Correct.
7  Q. I'm looking at a lawsuit dated
8  September 18th, 2008 involving a Charles
9  and Joanne Fratz that was brought in
10 Philadelphia County Court of Common Pleas
11 involving a motor vehicle accident against
12 James Keating [phonetic]. Are you the
13 Charles Fratz in this case?
14 A. No, I'm not.
15 Q. Is that your father?
16 A. That is my father.
17 Q. I'm looking at a lawsuit that was
18 filed October 29th, 2008 in Bucks County,
19 also a motor vehicle accident involving
20 Charles and Joanne Fratz against Katrina
21 and Katherine Cooper. Again, is that your
22 father, or is that you?
23 A. That is my father.
24    MR. EISENBERG: He's an

Page 6

1  so, and I'll be happy to rephrase it in
2  such a way that you understand and you can
3  respond; do you understand?
4  A. Yes.
5  Q. Let's not, and I'm very guilty of this
6  as well, try not to talk over each other.
7  I'm going to ask you a question, please let
8  me complete my question and then respond to
9  what I've asked you. On the same token,
10 while you're answering the question, I will
11 do my best not to talk over you and let you
12 complete your answer before I ask you
13 another question; do you understand?
14 A. Yes.
15 Q. I see you're shaking your head.
16 That's fine. But whenever you want to
17 answer a question, I need you to verbalize
18 it. The court reporter here does not know
19 what you mean when you shake your head.
20 A. Understood.
21        MR. EISENBERG: Although I
22    hear it.
23 BY MS. NEEDLEMAN:
24 Q. I can hear something going on in

Page 7

1  there, I just want to make sure that any
2  response to my question is the accurate
3  response that you wanted to give; do you
4  understand?
5  A. Yes.
6  Q. If at any time during this process and
7  this deposition you need take a break,
8  please let me know and I'll be happy to
9  accommodate you; do you understand?
10 A. Yes.
11 Q. The court reporter just swore you in,
12 meaning that the statements you're going to
13 make are going to be to the best of your
14 knowledge and truthful. If we take a
15 break, I ask that while you can talk to
16 your attorney, you cannot talk to your
17 attorney about any of the questions that I
18 have asked you in this deposition; do you
19 understand?
20 A. Yes.
21 Q. Have you in the last 24 hours taken
22 any over-the-counter drugs or medication
23 that would impair your ability to
24 understand or respond to my questions

Page 8

1  today?
2  A. No.
3  Q. Have you consumed any alcohol within
4  the last 24 hours which would impair your
5  ability to understand and respond to my
6  questions?
7  A. No.
8  Q. Very good. All right. Let's begin.
9     CJ, are you familiar with the lawsuit
10 that has been filed in this matter?
11 A. Yes.
12 Q. In your own words, can you tell me
13 what this lawsuit is about?
14 A. It is a class action suit that the law
15 firm representing Capital One, Goldman and
16 Warshaw -- I don't know -- they
17 misrepresented themselves in suing -- in
18 their suit against me.
19 Q. That's your understanding of the
20 lawsuit?
21 A. That's my understanding of the
22 lawsuit.
23 Q. That's fine.
24    And do you understand the claims that

Page 9

1  you have brought against Goldman and
2  Warshaw?
3  A. Yes.
4  Q. What are those claims?
5  A. That they brought wrongful suit
6  against me.
7  Q. When you say suit, do you mean the
8  action in Bucks County that they brought
9  against, the lawsuit in Bucks County that
10 they brought against you?
11 A. Yes.
12 Q. Do you understand what a class action
13 lawsuit is?
14 A. No, I do not.
15 Q. I'm going to show what I have marked
16 already as Fratz-1. I put that in front of
17 you. I'm going to give a copy to your
18 counsel. I'm going to ask that you keep
19 this copy. I've tabbed it, because there's
20 some pages in this document I want you to
21 look at. I just thought it would be easier
22 for you to get to those documents.
23    When was the first time you saw this
24 lawsuit?

## Page 62

1   like to take a break?
2   　　　THE WITNESS: Yeah. That
3   might help me rephrase my statement.
4   　　　(At this time, there was a
5   brief recess taken.)
6   BY MS. NEEDLEMAN:
7   Q. CJ, I'm going to try to reask my
8   question again.
9   　　I need you to explain to me -- you
10  understand the basis of the debt and what
11  that means; is that correct?
12  A. Yes.
13  Q. I need you to explain to me how the
14  customer agreement that was provided to
15  your attorney on March 29th, 2001 is a
16  false representation as to the basis of the
17  debt?
18  A. And my statement was that it is not
19  false in relation to Exhibit Fratz-4.
20  Q. Okay.
21  A. What I believe it to be false is to
22  charges prior to those provided in Fratz-4
23  that are included in the balance on
24  statements within Fratz-4.

## Page 63

1   Q. Okay. Do you believe that the
2   customer agreement provided to your
3   attorney on March 29th, 2001 is a contract
4   between yourself and Capital One?
5   　　　MR. EISENBERG: I have to
6   　object, Joanne.
7   　　　He's not a lawyer.
8   　　　MS. NEEDLEMAN: Well, I can
9   　ask what he believes.
10  　　　THE WITNESS: Can you repeat
11  　the question?
12  BY MS. NEEDLEMAN:
13  Q. Sure. Do you believe that the
14  customer agreement provided to your
15  attorney on March 29th is a contract
16  between you and Capital One?
17  A. I do not. No, I do not believe so.
18  Q. Were you aware on October 11th, 2001
19  there was an arbitration in the Bucks
20  County case?
21  A. Yes.
22  Q. And that you did not appear at that
23  arbitration, did you?
24  A. No.

## Page 64

1   Q. Why not?
2   A. I was working.
3   Q. You could not take the day off?
4   A. No. In my line of work I can request
5   a day off, but it is a request, it is not
6   something that is guaranteed. And I was
7   not given the day off.
8   Q. Had you made a request prior to the
9   arbitration for the day off?
10  A. No, I did not.
11  Q. So -- all right. Were you advised of
12  the outcome of the arbitration?
13  A. Yes.
14  Q. Are you prepared to pay Capital One
15  4,597-dollars and 51-cents which was the
16  arbitration award?
17  A. Meaning, do I have that money?
18  Q. Let me rephrase the question.
19  　　Are you aware that there was an award
20  against you?
21  A. Yes.
22  Q. Are you prepared to pay that
23  arbitration award?
24  A. Yes.

## Page 65

1   Q. How are you going to pay the award?
2   A. I don't know. At this point in time,
3   I do not have -- I don't know.
4   Q. Are you aware of whether your attorney
5   made any arguments regarding your FDCPA
6   claims which were in the answer to the
7   Bucks County case?
8   A. Am I aware of what was --
9   Q. Are you aware of whether your attorney
10  made any arguments regarding the FDCPA
11  claims which were part of your answer to
12  the Bucks County case?
13  A. I'm -- no.
14  Q. You were not aware?
15  A. No.
16  Q. Did you have any discussions with your
17  attorney prior to the arbitration about
18  what he was going to say in your defense?
19  A. Yes.
20  Q. How much have you paid Mr. Eisenberg
21  for his representation in the defense of
22  the Bucks County case?
23  A. I believe it was 1,500-dollars.
24  Q. And when did you pay him